IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

* * * * * * *

UNITED STATES OF AMERICA,                    CR 95-24-H-CCL

      Plaintiff,

-v-                                          <u>ORDER</u>

GREGORY C. CARPENTER,

      Defendant.

* * * * * * *

Before the Court is Defendant's "Motion Under 28 U.S.C. §
2255 To Vacate, Set Aside, or Correct Sentence By a Person in
Federal Custody."  Upon preliminary review, the Court determined
that Defendant's Motion was not filed within the one-year statute
of limitations imposed on 2255 motions by the Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2255,
which runs from the date of conviction if there is no appeal.  In
this case, Defendant's judgment of conviction was entered on
February 10, 1997, and he filed no direct appeal.

This Court therefore ordered Defendant to show cause why his

2255 Motion ought not be dismissed for failure to timely file within the one-year limitations period.  In response, Defendant submitted a letter to the Court requesting that he be granted equitable tolling of the one-year limitations period due to his mental incompetence.  In response, the government asserted that Defendant had failed to provide sufficient evidence of mental incompetence during the one-year limitations period, and the government requested that the 2255 Motion be denied as untimely filed.

Due to the fact that the Defendant has received treatment for mental illness during the period of his incarceration, and out of an abundance of caution, this Court ordered that a historical competency report be prepared by a psychological expert at U.S. Medical Center, Springfield, Missouri.  The Court also appointed counsel, Mr. Steven Haddon, to represent the Defendant at an evidentiary hearing, held on March 14, 2006.

At the evidentiary hearing, the government submitted the Forensic Mental Health Evaluation of Richart L. DeMier, Ph.D., Clinical Psychologist, dated February 26, 2006 (hereinafter, the

"2006 Forensic Report").  Defense counsel cross-examined Dr. DeMier regarding the content of the 2006 Forensic Report, and Defendant testified regarding his mental health history and alleged periods of mental incompetence.

<u>Background:</u>

On June 22, 1995, Defendant was charged with a five-count Indictment.  The charges stemmed from an incident which occurred in Montana State Prison on January 17, 1995, wherein Defendant, an inmate at the prison, was discovered to have placed an explosive or incendiary device in a false ceiling above the prison warden's office.  Defendant was charged with conspiracy to make a firearm (Count I), knowing possession of an explosive or incendiary device (Count II), knowingly making an explosive or incendiary device (Count III), felon-in-possession of a firearm (Count IV), and an attempt to damage or destroy an institution that receives federal financial assistance (Count V).

Defendant lodged a Plea Agreement on August 25, 1995, in which he agreed to plead guilty to Count V.  After signing the Plea Agreement and shortly before the scheduled change of plea

3

hearing, Defendant made a suicide attempt in his jail cell.  As a result, on the date of the scheduled change of plea hearing, October 27, 1995, both counsel in the case filed a Joint Stipulation for Psychiatric Examination, which the Court granted.

The Forensic Mental Health Report (hereinafter, the "1996 Forensic Report"), dated January 29, 1996, was prepared by James K. Wolfson, M.D., Staff Psychiatrist, at FMC Springfield.  Dr. Wolfson concluded both that the Defendant was competent to stand trial and also that the Defendant was able to understand the nature and quality of his acts at the time of the offense.  Dr. Wolfson opined that the Defendant's diagnosis was "History of Polysubstance Abuse" and "Antisocial Personality Disorder."  Dr. Wolfson did note the possibility of a history of "major depression" and a "possible borderline personality disorder."

However, Dr. Wolfson's report also contained numerous comments and descriptions of Defendant' malingering behavior, both historically and while under his observation at FMC Springfield.  Perhaps the origins of this behavior lie in the fact that the first charges filed against the Defendant as an

adult, at age 18, for theft, burglary, and criminal mischief, in both Missoula County and Cascade County, were all dismissed after the Defendant made a suicide attempt in jail and was transferred to the state psychiatric hospital.  Defendant was ultimately released from the hospital to the street with the diagnosis of a full recovery from a drug-induced psychosis.  That precedent may well have convinced Defendant that he could benefit by behaving as if he were severely mentally ill.  Both before then and since then, many mental health clinicians have come to the conclusion that Defendant was faking mental illness in order to avoid legal consequences:

    1.   In 1984, a clinician in the Montana State Hospital stated that the Defendant gave him "the impression that Mr. Carpenter's responses were rather glib and pat. Although he tended to say all the right things, the overall impression was that his responses were superficial and were designed to create sympathy in the examiner.  Basically, the examiner felt manipulated and had the strong impression that Mr. Carpenter hoped the [psychological] evaluation would somehow keep him from facing a prison sentence."  1996 Forensic Report at 13. In a second admission in 1984, the examiner gave the opinion "that the suicidal gestures represent continued attempts from Mr. Carpenter to avoid legal consequences." A clinical psychologist wrote that "it was the impression of this examiner that Mr. Carpenter is continuing to play games in order to avoid a prison sentence.  He utilizes suicidal gestures and threats as a manipulation tool, but must be considered a suicide

risk because of his impulsivity and acting on these impulses.  He is currently considered competent to understand the proceedings against him and to assist in his own defense." 1996 Forensic Report at 13-14.

2.    In 1984, Defendant submitted an I.Q. test that was a full 30 points below the test submitted a year earlier. "The psychologist noted, 'The MMPI was clearly faked. Mr. Carpenter did everything possible to present himself as seriously disturbed, when in fact this is not the case.'" 1996 Forensic Report at 14.

3.    In 1986, when Defendant's escape from Montana State Prison was foiled, he attempted to hang himself. (Defendant was then serving time in Montana State Prison for rape, burglary, and theft convictions.) Because of the 1986 suicide attempt, Defendant was sent back to Montana State Hospital, where a clinician noted "Mr. Carpenter shows no signs of mental illness, although he attempts to project such an image in an attempt to escape punishment for his antisocial behaviors." 1996 Forensic Report at 14.  Defendant's diagnosis was antisocial personality disorder, but he was medicated with an antipsychotic drug to try to control his "violent acting out and misbehavior".

4.    In 1990, after several escape attempts and another suicide attempt at Montana State Prison, Defendant was returned to Montana State Hospital, where Defendant was kept in a secure unit with locked cells.  "Apparently finding the secure area of the hospital not to his liking, the Defendant demanded that he be sent back to the prison and told staff that he would jump from a shelf in his cell onto his head if his demands were not met." 1996 Forensic Report at 15.  "Staff at the hospital concluded that the defendant 'showed no indications of mental illness of any kind.'" 1996 Forensic Report at 15.  Discharge diagnosis was antisocial personality disorder.

6

5.   While being evaluated in FMC Springfield in 1996,
     Defendant "maintained that prior suicide attempts
     happened exclusively in the setting of manipulating his
     caregivers, or as a means of initiating referrals for
     psychiatric attention." 1996 Forensic Report at 20.
     Defendant was given a test designed to detect
     fabrication of mental illness.  Of eight possible
     scales, only two scored in the "honest" responding
     range.  1996 Forensic Report at 22-23.  Defendant's
     discharge diagnosis was polysubstance abuse and
     antisocial personality disorder (with possible
     diagnosis of major depression and borderline
     personality disorder).

6.   When Defendant arrived at the Arizona Department of
     Corrections in July, 1997, he was interviewed by a
     staff psychiatrist who initially considered a diagnosis
     of either schizophrenia or malingering.  2006 Forensic
     Report at 9.  Within a month, the diagnosis was
     determined to be malingering ("feigning or grossly
     exaggerating mental health impairment for some
     secondary gain").  2006 Forensic Report at 9.  In July
     and August, 1998, staff in Arizona thought perhaps
     Defendant had become psychotic, and in September
     Defendant made cuts to his left arm and right hand, and
     he was placed on suicide watch.  In February 1999
     Defendant began mumbling incoherently, smearing feces
     in his cell, banging his head, and putting his head in
     his toilet.  2006 Forensic Report at 9-10.  Although it
     was not clear to the Arizona staff whether Defendant
     had a legitimate mental illness or was malingering, the
     mental health staff in Arizona nevertheless prescribed
     psychiatric medications for the Defendant.  Once on
     medication, the Defendant was stable and functioning
     appropriately from March 1999 through 2001.  Just prior
     to his release from the Arizona prison, the Defendant
     voluntarily discontinued medication in June 2001.
     Report at 10.  In July 2001, having served his time in
     the Arizona penal system, Defendant was transferred
     into federal custody.  Between July 1997 and July 2001

(excluding a nine-month period from June 1998 to February 1999), Arizona "records reflected that Defendant . . . experienced lengthy periods of time where he was alert, cooperative, compliant with medications, and participating in programming. Moreover, the difficulties he experienced were often attributed to malingering and/or his personality style." 2006 Forensic Report at 10.

7. Defendant was examined by psychology staff at FCI Phoenix in August 2001, and he denied any hallucinations or suicidal intent.

8. In October 2001, Defendant was transferred to USP Lompoc, and he was interviewed by Psychology Services, which found his gait, posture, mood, orientation to person/place/time, memory, concentration, attention, intelligence, thought content, and insight into personal problems to be average or normal.

9. In March, 2002, Defendant was transferred to USP Atwater. A psychological intent note states that Defendant acknowledged having been treated with medications for schizophrenia in the past, but "[a]ccording to Mr. Carpenter, he was feigning a mental illness in order to avoid prosecution and has not been receiving any form of mental health treatment for over a year. Furthermore, he reported previous suicide attempts, however he claims that it was for attention. According to Mr. Carpenter, he would make superficial cuts to his arms...." 2006 Forensic Report at 11. The staff at USP Atwater did not see any signs or symptoms of mental illness.

10. For the next year, Defendant was apparently untroubled, until August 21, 2003, when correctional officers began to note bizarre behavior. In September, Defendant was noted to be talking out loud to himself, biting his fingers, laying under his bunk, and hitting himself on the head. Staff concluded that Defendant was acutely

psychotic.  Defendant began to poke himself in the eye. Defendant became uncontrollable and had to be placed in restraints; he was transferred to FMC Springfield in October, 2003.

11.  In FMC Springfield, Defendant voluntarily took antipsychotic medications.  Whenever the dosage was reduced, Defendant began to manifest symptoms of excessive and intrusive religiosity.  Defendant was diagnosed with schizophrenia in 2004, but from October 2004, to November, 2005, Defendant "engaged in no self-injurious behaviors, he required no special treatment procedures (such as suicide watch), and he displayed no psychotic symptoms."  2006 Forensic Report at 13.

12.  In January, 2006, Dr. Richart DeMier examined the Defendant for the purpose of preparing a forensic mental evaluation and report for this Court. Dr. DeMier states that Defendant presents a "diagnostic conundrum," because Defendant's outright psychotic periods could easily be viewed as just more malingering.  Instead, however, Dr. DeMier believes that the most cautious approach is to give Defendant a diagnosis of "schizophrenia, undifferentiated type, by history."  The "by history" means that Dr. DeMier has not seen any symptoms of schizophrenia, himself, but other qualified mental health professionals in the past have seen such symptoms and have attributed that diagnosis to the Defendant.  However, Dr. DeMier states that "[i]t is nevertheless important to acknowledge the possibility that [Defendant] is, and has been, malingering."  2006 Forensic Report at 15. Significantly, Dr. DeMier concludes that "[r]egardless of the legitimacy of his psychotic illness, it is abundantly clear, in our opinion, that Mr. Carpenter's primary diagnoses are disorders of character.  He is diagnosed with both antisocial personality disorder and borderline personality disorder."  2006 Forensic Report at 15.

9

This Court has had its own experience with the Defendant. Returning to Defendant's history in this Court, the Court held a competency hearing on April 5, 1996, and neither Defendant nor his counsel objected to Dr. Wolfson's psychiatric report, which concluded that Defendant was competent.  This Court found Defendant competent to proceed.  When this Court questioned the Defendant regarding his intent to enter a guilty plea, however, the Defendant looked at the floor and mumbled his answers despite the Court's admonition to speak up.  The Court concluded that the Defendant was unable to proceed with the change of plea hearing and continued the same until a later date.

After several scheduling delays, the Court reset the hearing for August 13, 1996.  At that time, Defendant appeared for the change of plea hearing, but he whispered and refused to speak into the microphone, with the result that the undersigned presiding judge could not hear his answers to the Court's questions.  Once again, the Court terminated the change of plea hearing due to the Defendant's conduct.  Shortly thereafter, the Court set down a jury trial for the Defendant, to be held on September 30, 1996.  Defendant submitted a motion to change his

plea two weeks before the trial, and the Court denied the motion because the Court had already given the Defendant two opportunities to change his plea (three opportunities, counting the first change of plea hearing set down) and the Defendant either was unable to change his plea or *feigned* (in the Court's words at that time) being unable to change his plea.  Counsel for Defendant admitted in the motion to change plea that he was not optimistic that Defendant would behave any differently in the third change of plea hearing than in the previous two hearings that were terminated.  Thus, in 1996, this Court was of the opinion that Defendant's behavior was designed by him to obfuscate and delay the Court's administration of the case.

A jury trial was set down.  The day before that trial, defense counsel filed a motion for change of plea.  In response, this Court reminded Defendant that he had "failed to cooperate during two previous change-of-plea hearings.... [wherein he] postured, whispered, and refused to speak loudly enough for the court to hear his answers to the court's questions and either was, or feigned to be, unable to continue."  *See* Order dated November 4, 1996 (Docket #72).  The Court found the motion to be

11

untimely, and it was therefore denied.

Defendant was convicted on all five counts on the second day of trial.  Defendant was sentenced on February 7, 1997.  His Offense Level was 32, his Criminal History was VI, and his Guideline Range was 210-262 months.  At the sentencing hearing, defense counsel informed the Court that Defendant had refused to review the Presentence Report with counsel and when defense counsel attempted to give the Defendant a copy of the Presentence Report, Defendant would not respond.  Defense counsel reported that Defendant said he left it (presumably the sentencing hearing) in the hands of his counsel.  Defendant was sentenced to concurrent 120-month sentences on Counts 1-4 and a concurrent 240-month sentence on Count 5.[1]  The Court's written Judgment and Commitment was filed and entered on February 10, 2007.

Defendant's 2255 Motion

In his 2255 Motion, Defendant acknowledges that he filed no direct appeal, stating that he left that in the hands of his lawyer.  In subsequent correspondence with this Court, Defendant

---

[1]  Defendant's proffered Plea Agreement is part of the record (See Docket #88).  In his signed Plea Agreement, Defendant acknowledged that he was guilty of Count V, and he acknowledged that the penalty for Count V was a sentence of 240 months.

asks this Court to equitably toll the one-year limitations period for filing a 2255 Motion following finalization of judgment of conviction.  Defendant asks this Court to find that he was mentally incompetent and unable to file a 2255 Motion between February 10, 1997, and September 22, 2003, when he finally did file his 2255 Motion.  Actually, Defendant's Judgment and Commitment was finalized after February 24, 1997, which was the last day on which Defendant could have filed a direct appeal. *See United States v. Schwartz*, 274 F.3d 1220, 1223 (9th Cir. 2001) (when no direct appeal filed, conviction is finalized for AEDPA purposes when 10 day period for filing notice of appeal expires).  There are 2,401 days between February 24, 1997, and September 22, 2003.

Equitable Tolling

Mental incompetence does justify equitable tolling when "extraordinary circumstances beyond a prisoner's control makes it impossible to file a petition on time and the extraordinary circumstances were the cause of his untimeliness." *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir. 2003).  The equitable

tolling doctrine applies to section 2255 motions.  *United States v. Battles*, 362 F.3d 1195 (9th Cir. 2004).  However, the tolling starts and stops when the mental incompetence starts and stops, so that Defendant would have to persuade the Court by a preponderance of the evidence that he was not mentally competent and able to file a petition for 365 days within the 2,401 day period.  *See Gaston v. Palmer*, 417 F.3d 1030, 1034 (9th Cir. 2005) (defendant's burden to show equitable tolling appropriate).  This the Defendant has been unable to do.  Although Defendant does have some periods of at least debatable mental incompetence (notably, the 210 days between July 1998 and February 1999, and the 60 days in August-September 2003), the evidence shows that Defendant was mentally competent during the vast majority of the 2,401 day period.

Furthermore, the Court notes that the Defendant's bizarre behavior in August and September, 2003, coincides with the time period just after this Court issued two orders in response to the Defendant's letters to the Court.  Defendant's first letter to the Court was received on February 27, 2003, and in this letter Defendant asked to appeal his conviction.  In response, this

14

Court issued an order on March 12, 2003, instructing Defendant to fill out a 2255 Motion form that was sent to the Defendant with the Court's order.  In the March 12, 2003, order, the Court also pointed out to the Defendant that he should have filed his 2255 in 1997, noting that Defendant's letter had failed to state "whether any extraordinary circumstance beyond his control made it impossible for him to file a § 2255 Motion on time."  (Docket #97).

In response to this Order, Defendant sent two letters to this Court.  The first letter, dated April 21, 2003, requested appointment of counsel.  The second letter, dated May 26, 2003, was a six page single-spaced typewritten description of Defendant's thoughts and feelings about his conviction and sentence.  In his second letter, dated May 26, 2003, Defendant states that there were extraordinary circumstances beyond his control that "deserve[d] tolling."  Defendant explains that he was "under extreme duress and fear for [his] life and well being."  Defendant states that he while he was being prosecuted in this federal district court (in 1996), he was incarcerated in Montana State Prison's maximum security unit, and while there he

15

believed that his food was being drugged and he was being

mistreated (denied showers, given cold food, deprived of food,

unhygienic conditions, etc.).  Defendant asserts that he did not

find out that no appeal was pending until he went into federal

custody, and he telephoned defense counsel from USP Atwater to

ask whether he had an appeal pending.  Defendant states:

> It was Arizona that finally responded to my health
> needs, but it took their mental health staff four years
> to help me.  I remained in the hole almost four years.
> While in Arizona State Prison, I was placed in mental
> health and medicated because of the duress and its
> lingering psychological effects.  I spent almost four
> years under these effects.  I was seeing both doctors
> and psychologists for help. ... I suffered under this
> duress and psychological state of mind for years and
> slowly recovered from it upon arriving in the federal
> prison system.

Defendant's Letter to Court dated May 26, 2003.  Defendant thus

claims that he suffered psychologically while incarcerated in

Montana State Prison and that he began to recover once he entered

the Arizona prison and finally a federal prison.

On June 13, 2003, this Court denied Defendant's motion for

appointment of counsel, explaining that "Defendant is articulate

in his letters to the Court, and he seems to be able to express

his concerns in a clear-enough fashion...."  Order dated June 13,

2003, at 2.  Defendant then filed his §2255 Motion on

September 22, 2003.  The §2255 Motion form is properly filled in,

it is clear and concise, and it states Defendant's claims in

plain language, such as this:

>     "My attorney decided to lead me to court.  He had his
>     reasons and professional judgment that I don't
>     understand.  I tried to settle with my adversary on the
>     way to see the judge.  A notice of appeal was not filed
>     on my behalf after I trusted in my attorney's
>     professionalism and judgment.  I do not understand why
>     my appeal was denied but respect his faith.  I deserve
>     a chance to [tell] the truth."
>
>     . . .
>
>     "The device that I was convicted of was <u>harmless</u>!  I
>     truely believe this and it was stated so by Jeff Grow,
>     ATF agent.  Damage to a piece of state property should
>     not constitute a federal crime of this magnitude.  For
>     example, damage to a state locker, a desk, etc. . . by
>     fireworks is not an institution that constitutes a
>     federal jurisdiction by damage to state property.

2255 Motion at 6 (Docket #99).  The Court notes that this §2255

Motion was submitted right in the midst of Defendant's apparent

lapse into psychosis at USP Atwater—when Defendant was biting his

fingers, laying under his bunk, and periodically hitting himself

on the head, among other behaviors.  *See* 2006 Forensic Report at

12.  Due to this apparent psychotic behavior, Defendant was

forthwith transferred to FMC Springfield, where Defendant

17

"quickly stabilized" and accepted antipsychotic medications. Since then, Defendant has displayed no psychotic symptoms at FMC Springfield, and he engaged in no self-injurious behaviors.  2006 Forensic Report at 13.

The evidence is thus conflicting.  On the one hand, Defendant was able to write a clear and concise §2255 Motion to seek legal benefits.  On the other hand, Defendant was behaving in a manner that caused mental health staff at USP Atwater to believe that he was psychotic.  When Defendant began behaving strangely at USP Atwater, in August-September, 2003, Defendant at that time knew that he had been denied counsel because his letters to the Court showed that he was articulate and clear in his writings, and Defendant also knew that the Court considered his request for an "appeal" to be untimely and would require him to provide the Court with an excuse of "extraordinary circumstances" to justify his untimely filing of a §2255 Motion. Shortly thereafter, Defendant began exhibiting psychotic behaviors for the first time in four years, all the while sending this Court correspondence that appears to be logical, articulate, and goal-oriented.

In fact, in the many letters Defendant has written to the Court since 2003, each letter has been logical and clearly focused on a particular goal, such as obtaining appointed counsel, seeking to justify an untimely petition, or simply to exhort the Court to provide him with a 'second chance' and an opportunity for freedom from incarceration.

The question arises whether Defendant occasionally lapses into mental illness or simply fakes mental illness for some ulterior motive.  The Court listened carefully to Defendant's testimony at the evidentiary hearing on March 14, 2006. Defendant insisted that he had once seen a red devil and it had frightened him, but Defendant had to review his records to answer the question 'when did that occur' (1979).  Defendant seemed to have no idea when this frightening hallucination or apparition had come to him, and Defendant could not even venture a guess but preferred to consult his papers to provide a date.  Defendant was asked whether the medications he was on while incarcerated in Arizona made him sleep.  Defendant said yes.  Then he was asked whether the medications made him stop hallucinating.  Defendant

denied that they did, stating vaguely that the voices come and go, and that he didn't know if he was hearing the voices while he was sleeping or not.  It appeared to the Court from the Defendant's testimony that he was going to great length to deny ever having a respite, even if only temporarily due to medication, from mental illness.

It is this Court's opinion that Defendant has been deceptive with both his counselors and the Court, but this is not ultimately the deciding factor here.  Defendant still has not shown by a preponderance that he was mentally incompetent for most of the period between the finalization of his conviction on February 24, 1997, and September 22, 2003.  In fact, the evidence provided by Dr. DeMier's 2006 Forensic Report shows that since finalization of his conviction, Defendant has enjoyed mental competence for far more than 365 days out of the total of 2401 days.  Defendant is not therefore entitled to equitable tolling of the one-year limitations period, and therefore Defendant's §2255 Motion is untimely and should be summarily dismissed.

Accordingly,

IT IS HEREBY ORDERED that Defendant's "Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody" is DENIED.  Let judgment enter.

The Clerk is directed forthwith to notify counsel and the Defendant of entry of this order.

DATED this 22nd day of May, 2006.

_____
CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE

21